95 So.2d 808

FARM INDUSTRIES, DIVISION OF the QUAKER OATS COMPANY

v.

Joe B. HOWELL.
Feb. 21, 1957.

6 Div. 368.

Court of Appeals of Alabama.
May 28, 1957.

Weaver & Snoddy, Haleyville, for appellant.

Posey & Posey, Haleyville, for appellee.

CATES, Judge.

On May 9, 1955, Farm Industries, Division of the Quaker Oats Company brought detinue in the Winston Circuit Court for the recovery in specie of thirty-two hundred pounds of Full-O-Pep broiler feed, consisting of sixty-four bags of fifty pounds each.

After the court had overruled his demurrers, the defendant, Howell, plead not guilty and brought counter suit by way of set-off and recoupment, alleging a contract whereunder Farm Industries bailed some 16,000 chicks with Howell under a "feeding out" agreement whereunder the chicks delivered by Farm Industries to Howell were to remain the property of Farm Industries. Howell was to feed them only Full-O-Pep broiler feed, and upon their being ready for market, he was to be paid a fee and a bonus for the chickens returned alive on a formula involving (1) a bonus for the average weight per fowl varying from 0 to ½ cent and (2) a fee scaled to the ratio of feed to delivered bird, which was set in ranges called "feed conversion" rates.

The agreement which was in evidence is as follows:

3.,

FARM INDUSTRIES
Division of
The Quaker Oats Company
Decatur, Alabama

BROILER GROWER CONTRACT F

AGREEMENT by and between ___Joe B. Hewell___
(Grower)

of ___Double Springs, Ala., RT. 3___
(Address)

hereinafter called GROWER and Farm Industries, Division of The Quaker Oats Company, of
Decatur, Alabama, hereinafter called FARM.

1. GROWER represents that GROWER is in a position to care for and raise once
every three to four months a flock of approximately ___16000___ baby chicks until
they are marketable as broilers.

2. FARM will, from time to time, furnish GROWER with a flock of baby chicks,
the number in each flock to be determined by FARM, together with all feeds and medicines
necessary to grow the chicks to marketable size as broilers. GROWER will sign delivery
receipts for everything received from FARM.

3. GROWER will provide proper housing, equipment, heat, water, light, litter
and labor and will properly feed and care for the chicks in accordance with FARM'S in-
structions so they may reach a good and marketable size as broilers. GROWER will main-
tain such growing records as FARM may request. GROWER will use only those feeds and
medicines furnished by FARM in the growing of the chicks. GROWER will assist in weighing
and will furnish sufficient labor to catch the chickens.

4. GROWER will, at such time FARM designates, return the live chickens to
FARM. GROWER shall be entitled to a fee for the caring and raising of the chickens
that are returned alive and are marketable as broilers, as follows:

RATES OF PAYMENT TO GROWER - (Cents per pound, rounded to tenths)
FEED CONVERSIONS

| Where Farm quoted price for purchase of live marketable broilers on date of delivery to plant is: | Below 2.47 | 2.48 2.52 | 2.53 2.57 | 2.58 2.62 | 2.63 2.67 | 2.68 2.72 | 2.73 2.77 | 2.78 2.82 |
|---|---|---|---|---|---|---|---|---|
| | | CENTS PER POUND | | | | | | |
| 30¢ up | 7.8 | 7.6 | 7.4 | 7.2 | 6.9 | 6.7 | 6.4 | 6.2 |
| 29-29-1/2 | 7.1 | 6.9 | 6.7 | 6.5 | 6.3 | 6.0 | 5.8 | 5.6 |
| 28-28-1/2 | 6.5 | 6.3 | 6.1 | 5.9 | 5.6 | 5.4 | 5.2 | 5.0 |
| 27-27-1/2 | 5.9 | 5.6 | 5.4 | 5.2 | 5.0 | 4.7 | 4.5 | 4.3 |
| 26-26-1/2 | 5.2 | 5.0 | 4.8 | 4.6 | 4.3 | 4.1 | 3.9 | 3.6 |
| 25-25-1/2 | 4.5 | 4.3 | 4.1 | 3.9 | 3.7 | 3.4 | 3.2 | 3.0 |
| 24-24-1/2 | 3.9 | 3.7 | 3.4 | 3.2 | 3.0 | 2.8 | 2.5 | 2.3 |
| 23-23-1/2 | 3.3 | 3.0 | 2.8 | 2.6 | 2.3 | 2.1 | 1.9 | 1.7 |
| 22-22-1/2 | 2.6 | 2.4 | 2.2 | 1.9 | 1.7 | 1.5 | 1.2 | 1.0 |
| 21-21-1/2 | 2 0 | 1.7 | 1.5 | 1.3 | 1.1 | 0.9 | 0.8 | 0.6 |
| Under 21 | 1.7 | 1.5 | 1.4 | 1.2 | 1.1 | 0.9 | 0.8 | 0.6 |

FEED CONVERSIONS

| | 2.83 2.87 | 2.88 2.92 | 2.93 2.97 | 2.98 3.02 | 3.03 3.07 | 3.08 3.12 | 3.13 3.17 | 3.18 up |
|---|---|---|---|---|---|---|---|---|
| | | CENTS PER POUND | | | | | | |
| 30¢ up | 6.0 | 5.8 | 5.5 | 5.3 | 5.1 | 4.9 | 4.7 | 4.6 |
| 29-29 1/2 | 5.4 | 5.1 | 4.9 | 4.6 | 4.4 | 4.2 | 4.1 | 3.9 |
| 28-28-1/2 | 4.7 | 4.5 | 4.2 | 4.0 | 3.8 | 3.6 | 3.4 | 3.3 |
| 27 27-1/2 | 4.1 | 3.8 | 3.6 | 3.3 | 3.1 | 2.9 | 2.8 | 2.6 |
| 26-26-1/2 | 3.4 | 3.1 | 2.9 | 2.7 | 2.5 | 2.3 | 2.1 | 1.9 |
| 25-25-1/2 | 2.7 | 2.5 | 2.3 | 2.0 | 1.8 | 1.6 | 1.5 | 1.3 |
| 24-24-1/2 | .2.1 | 1.8 | 1.6 | 1.4 | 1.2 | 1.0 | 0.8 | 0.6 |
| 23-23-1/2 | 1.4 | 1.2 | 0.9 | 0.7 | 0.5 | 0.3 | 0.2 | 0 |
| 22-22-1/2 | 0.8 | 0.5 | 0.3 | 0.1 | 0 | (-0.2) | (-0.4) | (-0.5) |
| 21-21-1/2 | 0.5 | 0.3 | 0.2 | 0 | (-0.2) | (-0.4) | (-0.5) | (-0.5) |
| Under 21 | 0.5 | 0.3 | 0.2 | 0 | (-0.2) | (-0.4) | (-0.5) | (-0.5) |

In cases of low prices and high conversions the
minus figures shown in parenthesis (-.0) will
be taken from weight bonus only.

BROILER GROWER AGREEMENT F

In addition to the fee provided above, FARM will pay GROWER a bonus for growing each pound of live marketable broiler returned to FARM, based on the average weight of the bird according to the following weight schedule: (average weight per broiler is determined by dividing total weight of live marketable broilers returned by the number of such broilers).

| Average Weight | Bonus |
|---|---|
| 2.45 - 2.54 | 0 |
| 2.55 - 2.64 | 0.1¢ |
| 2.65 - 2.74 | 0.2¢ |
| 2.75 - 2.84 | 0.3¢ |
| 2.85 - 2.94 | 0.4¢ |
| 2.95 - 3.00 | 0.5¢ |

GROWER and chicken hauler will agree in advance as to the number of broilers to be loaded per coop.

GROWER and chicken hauler will count the number of loaded coops and agree on the head count by signing the statement on the back of the weight ticket.

5. Title to the chicks and all feeds and medicines furnished GROWER remains in FARM. FARM may place signs at such places on GROWER'S premises that FARM deems advisable that the chicks are the property of FARM. GROWER will not remove from his premises, or otherwise dispose of the chicks, feeds, and medicines except as provided herein. FARM'S representatives shall have access to GROWER'S premises at all reasonable times to inspect the chicks and GROWER'S operation.

6. GROWER will, before receiving any flock of chicks, completely wash the inside of his chicken houses with water under pressure from hose and perform such other cleaning operations as FARM may deem necessary.

7. FARM may terminate this agreement at any time by so notifying GROWER and, if GROWER is then growing a flock of chicks, GROWER will immediately return the chicks and any unused feeds and medicines to FARM.

8. GROWER may not assign this agreement, or in any way encumber chickens covered by this agreement.

9. Nothing in this agreement shall create a joint adventure or partnership between the parties.

10. This agreement shall be jointly and severally binding upon all persons signing as GROWER.

11. This written agreement constitutes the entire agreement between the parties and no verbal agreement shall alter or add to any part hereof.

EXECUTED this __29__ day of __nov._____. 195_4_

_____
(Grower)

_____
(Grower)

_____
(Grower)

FARM INDUSTRIES
Division of
The Quaker Oats Company

BY: _____

The count of Howell's answer, which plead set-off and recoupment, reads as follows:

"That on the 20th day of November, 1954, he entered into a contract with the plaintiff by the terms of which plaintiff would deliver to the defendant baby chickens and furnish all feed and medicine for said chickens and by the terms of said agreement defendant was to furnish the house and feeding equipment and labor to grow the chickens out to marketable size and plaintiff agreed to pay to defendant as base pay a certain sum based on the amount of feed required to produce each pound of weight of chickens and defendant alleges that plaintiff delivered to him sixteen thousand chickens to be grown out under said agreement and that Defendant performed his duties according to the terms of said contract and that chickens were delivered to the plaintiff on the 3rd day of February, 1955; and that the total weight of said chickens was 44,001 pounds; that the feed required to produce each pound of chicken was 2.60 pounds of feed per pound of chicken; that by the terms of said contract when the price of chickens was 25–25½ cents per pound the plaintiff would pay the defendant the sum of 3.9 cents per pound; that said sum amounted to Seventeen Hundred Sixty Dollars and Four Cents. That by the terms of said contract plaintiff agreed to pay to the defendant an additional sum based on the average weight of said chickens and that according to said agreement plaintiff was due the defendant the sum of .4 cents per pound of chicken grown and that he is due the defendant the sum of $176.00 as bonus under the terms of said contract. Plaintiff has heretofore paid to the defendant the sum of $440.02 which leaves a balance due the defendant by the plaintiff of $1,012.02, which sum with the interest thereon is due and unpaid."

The jury's verdict, to which the judgment appropriately responds, was a finding for Farm Industries in the detinue count with an alternate value of the chicken feed assessed at $177, and assessment of damages in favor of Howell on his plea of set-off and recoupment in the amount sued for, i. e., $1,012.02.

Farm Industries filed a motion for new trial, the first four grounds of which presented in various aspects the sufficiency of the evidence; the fifth ground was that the damages awarded Howell were excessive; the sixth that they were so excessive as to show bias or other improper motive; the seventh that the verdict was contrary to the court's oral charge; and grounds eight, nine, ten and eleven were predicated upon the court's alleged error in refusing charges, of which the following was typical:

"1. I charge you, gentlemen of the jury, that when a party to a law suit calls the adverse party as a witness, the party calling him is not precluded from proving that the facts are different to the facts testified to by the adverse party."

The motion for new trial was overruled, and hence to us upon appeal.

The evidence shows only two areas of conflict: first, what was the proper price per pound of chickens to be used in applying the formula under the feed conversion ratio; and, second, how many pounds of feed (and, therefore, the feed conversion ratio) were delivered to Howell under the agreement?

There is no dispute that Howell received some 16,000 chickens, and that Farm Industries, on February 3, 1955, sent a truck to his farm and picked up 15,336 chickens. The total weight of these chickens was 44,001 pounds, for an average of 2.87 pounds to the broiler, thus making Howell's compensation under the bonus clause $176. It is further undisputed that the figure $440.02 alleged in Howell's answer to

have been paid him by Farm Industries was actually $880.02. The disagreement between the parties in the evidence revolves around two things: What was the market price of broilers on February 3, 1955, within the meaning of the expression in the contract which says, "Where Farm quoted price for purchase of live marketable broilers on date of delivery to plant is," and the feed conversion ratio which would depend upon the quotient resulting from dividing the number of pounds of delivered birds (undisputedly 44,001) into the amount of feed used by Howell in growing the fowls.

■ Howell testified that he received the chickens in November of 1954 and had sometime shortly theretofore obtained 300 bags each containing 50 pounds of chicken feed from Farm Industries. On direct examination he testified as to certain delivery tickets, which, together with the above mentioned 300 bags, would have brought the total poundage of feed delivered to him to some 95,250 pounds. This figure divided by 44,001 would give a smaller conversion ratio than that to which Howell contended in his pleading, i. e., 2.60 pounds of feed per pound of chicken. In addition to this undisputed 95,250, Farm Industries adduced evidence, the tendency of which was that Howell had also received approximately 87,500 pounds of feed over and above the 95,250. As we view the averments in Howell's plea of set-off and recoupment, it is essentially a claim for $1,012.02 due under a contract, and if the computations set forth in the pleading which arrive at that result are not the only figures which would produce the same amount, the details of the mathematical computation should not cause the defendant to be cast in his suit, provided the evidence is such as would support the judgment. We consider that the range of the evidence was such as to have allowed the jury to have reached the result shown in its verdict.

Farm Industries contends that Howell's testimony as to the market price of broilers on February 3, 1955, should not have been admitted; first, because it was based on hearsay, and, second, because it did not respond to the provisions of the contract as to what was "Farm quoted price."

Code 1940, Title 7, § 367, provides as follows:

"§ 367. Market value; how proved. —Direct testimony as to the market value is in the nature of opinion evidence. One need not be an expert or dealer in the article, but may testify as to value, if he has had an opportunity for forming a correct opinion."

This section was probably law without the necessity of its codification. Thus, in Burks v. Hubbard, 69 Ala. 379, the testimony as to the price of cotton was properly admitted. The court there said:

"The testimony of Allen as to the price of cotton was properly admitted. Taken in connection with the preceding interrogatory and answer, it obviously had reference to the market price of cotton, a conclusion which is largely made up of presumptions, and may always be proved by the opinions of witnesses based of necessity, in part at least, on hearsay.—1 Whart.Ev. § 448."

See also Alabama Consolidated Coal & Iron Co. v. Turner, 145 Ala. 639, 39 So. 603, and American Oak Extract Co. v. Ryan, 112 Ala. 337, 20 So. 644.

In considering the Code section above, this court, in Morris v. State, 25 Ala.App. 494, 149 So. 359, 360, stated as follows:

"A witness is allowed to give his opinion of value, if he has had an opportunity of forming a correct opinion. This is a preliminary question to be passed upon by the court and is a matter largely within his discretion. 22 C.J. 526 (610)b. This discretion will not be reviewed except in cases where it is clearly made to appear that the ruling was unjust and worked an injury to defendant's cause. 22 C.J. 526

(610)b, and Alabama authorities cited under note 11."

■ We believe that there was no showing that the trial court abused its discretion in admitting Howell's testimony as to the market value; and further that his statement on cross-examination that his judgment thereon came from what he had heard on the radio, read in the newspapers, and had been told on the telephone did not vitiate his testimony, but only went to the weight of it. Moreover, it is to be noted that Farm Industries introduced in evidence a document issued by the Federal-State Market News Service, "Daily Market Report (Dairy and Poultry Products)," for Thursday, February 3, 1955, which we consider to have been based as much on hearsay as Howell's oral testimony, particularly since Farm Industries based its price per pound upon the prices listed therein for the North Georgia poultry products area rather than for that shown therein for Alabama. We do not consider this daily market report as being in the same category as the reports for such markets as the New York Stock Exchange, where the prices are based on actually completed sales with the representatives of buyers and sellers being vis a vis during the transaction of business. As we undertand the Federal-State Market News Service's daily report, it is a collation of information based primarily on what might be called the posted prices on a given day of chicken processors over quite a wide area. Apparently information is also elicited from large growers, finance companies, and feed dealers to the end that the market reporter makes up what he considers to be a statement as to the strength of the market and the prices paid. There being no central market place, this procedure must necessarily result in a synthesis rather than an actual product of the operation of the law of supply and demand as reflected by buyers and sellers brought together under identical conditions. Accordingly, we do not think, on this record, that the prices taken from this report can be accorded the same certainty as a sales price on a commodity or

securities exchange. See Maxwell Planting Co. v. A. P. Loveman & Co., 212 Ala. 228, 102 So. 45, and Union Naval Stores Co. v. Patterson, 179 Ala. 525, 60 So. 807. This results in a conclusion that Code 1940, Title 7, § 385, which reads, "Prices current and commercial lists, printed at any commercial mart, are presumptive evidence of the value of any article of merchandise, specified therein, at that place, at the date thereof, and of the rate of exchange between that and other places; also of the rates of insurance, freights, and the times of arrival and departure of ships and other vessels," does not apply to this report although its introduction in evidence would be permissible in bolstering opinion evidence under § 367, supra.

■ The refusal of Farm Industries' requested charges mentioned above does not, in our opinion, put the trial court in error. The circumstance in which the predicate for the requested charges arose was that Howell was called as a witness for Farm Industries to prove that he entered into an agreement with that organization. Farm Industries then attempted to examine him in contradiction of what he had testified upon cross-examination by his own attorney, to which the trial court sustained an objection. Whether or not further latitude should have been granted Farm Industries in this posture we need not decide, since at a later stage of the trial Howell took the stand in his own behalf and was subjected to thorough cross-examination which went into matters contradictory of those shown by Farm Industries' other witnesses, particularly the market price of broilers and the amount of feed delivered to Howell. Accordingly, we see no injury, Supreme Court Rule 45, Code 1940, Tit. 7 Appendix.

We do not construe that the expression, "Farm quoted," used in the contract means quoted by Farm Industries. In arriving at this result, we do not consider it necessary to go into whether or not one party may establish the amount to be paid the other party, since we note that throughout the

entire agreement, in referring to Farm Industries as a contracting party, which agreement undoubtedly appears to have been prepared by it, the expression, "FARM," is used, whereas in the operative section here alluded to the expression is without the benefit of bold face form. We construe the language to mean the market price on the date of delivery at a plant based on the market value of comparable chickens at the farm, and that the center of gravity of the price would seem to be much closer to Winston County, Alabama, than Gainesville, Georgia, particularly under the state of the evidence before us. Since there is nothing in this record to show, other than the conclusions of some of Farm Industries' witnesses, that the North Georgia market dominates the North Alabama market, such statements being used to bolster the witnesses' testimony of the market price were for the jury to consider, and present no matter which would call for a reversal on our part. The judgment of the court below is affirmed.

Affirmed.